[No. 29757. Department Two. February 19, 1946.]

EMMA ROLLER, *Respondent,* v. HARTFORD ACCIDENT AND INDEMNITY COMPANY, *Appellant.*[1]

[1]Reported in 166 P. (2d) 173.

*A. A. Hull,* for appellant.

*Edgar P. Reid,* for respondent.

ROBINSON, J.—This is an action upon an accident insurance policy. There is no substantial controversy as to the facts. The record shows, without contradiction, that, on May 16, 1943, Ferdinand Roller, the plaintiff's husband, fell from an automotive vehicle and received injuries from which he died about two weeks later. In November, 1925, Mr. Roller had taken out a policy in the appellant company, payable to his wife, Emma Roller, in case of death. Those portions of the policy which are material to the inquiry are as follows:

"The Hartford Accident and Indemnity Company hereby insures the person named in Answer 1 of the copy of the application endorsed hereon (subject to the terms, provisions, and limitations hereinafter contained) AGAINST LOSS caused directly and exclusively by bodily injury sustained, solely and independently of all other causes, through accidental means, as follows:

"A. While operating, driving, riding in, demonstrating, adjusting or cranking an automobile.

"B. In consequence of the explosion or burning of an automobile.

"C. In consequence of suffocation caused by carbon monoxid gas from the exhaust of an automobile.

"D. In consequence of being struck, run down or run over by an automobile while walking on or across any public highway.

"Section 1. If any loss specified in this Section shall result directly and exclusively from such injury within ninety days after the date of the accident, the company will pay a fixed indemnity for such loss as follows:

"Loss of life.................................$5000"

This policy was still in force in May, 1943, having been continued in effect by the payment each year of an annual premium which, from 1925 to 1933, was the sum of ten

dollars per year, and from there on until the time of the death of the insured, twelve dollars per year. Since, in effect, the insurance company was wagering 500 to 1 during the initial period, and 416 to 1 from 1933 to 1943, that the insured would not lose his life within a calendar year, under the circumstances set out in A, B, C, and D of the above-quoted coverage, it would naturally be expected that exclusion clauses would be found in the policy. These are set out in large black type, under a prominently printed heading, "Additional Provisions," and it may be interpolated here that no contention is made that the deceased was in any way deceived or misled. As far as material to our present inquiry, the language used under these additional provisions is as follows:

"(b) This insurance shall not cover . . . injuries, fatal or otherwise, received by the insured . . . (6) while driving or riding in or on any . . . automobile truck, . . ."

The jury returned a verdict for the plaintiff beneficiary. On appeal, the insurance company assigns four errors, to wit: (1) that the court erred in denying its motion for a nonsuit; (2) in denying its motion for a directed verdict; (3) in denying its motion for judgment notwithstanding the verdict; and (4) in entering judgment in favor of the plaintiff.

Our rules require an appellant to state, in his brief, the question or questions presented by the appeal, and permit the respondent to make a counterstatement in case he be not satisfied therewith. In this instance, the appellant states but one question, which reads as follows:

"1. Is a Chevrolet one-half ton pickup truck an automobile truck within the exclusion clause of an insurance policy excluding from the risk insured against 'injuries, fatal or otherwise, received by the insured . . . while driving or riding in or on any . . . automobile truck . . . ' ?"

No counterstatement is made by the respondent, and, since the jury's verdict must mean that it found that the vehicle involved was not within the meaning of the phrase

"any automobile truck," we are limited to the inquiry: Was there any substantial evidence introduced which supports such a finding? If there was not, all four assignments of error are well taken.

The appellant contends that the decision in this court in *Johnston v. Maryland Cas. Co.*, 22 Wn. (2d) 305, 155 P. (2d) 806, decided after the trial of the instant case, but several months before the judgment appealed from was entered, is controlling authority in its favor. The cases are very similar. As revealed by the exhibits, the respective vehicles involved are so alike, in general design, that about the only difference that can be seen, in comparing the pictures thereof, is that the vehicle in the *Johnston* case has the word "Dodge" on the hood.

The plaintiff in this case contended that the vehicle was a pickup and not a truck. A similar contention was made in the *Johnston* case, and the evidence largely relied on was a Dodge advertisement containing a picture of the vehicle labelled "Model WC 1/2-Ton Pick-Up." But other Dodge literature was introduced in that case referring to the same type of vehicle as a "truck." In this case, also, there are exhibits of Chevrolet literature and advertising in which both designations are used.

It was urged in the *Johnston* case, as in this, that, since the vehicle could, and often did, carry passengers, it was not a truck.

In the *Johnston* case, as in this, a witness testified that he would call the vehicle "a pickup" and not a truck, but, nevertheless, this court set aside the jury verdict for the plaintiff beneficiary.

In the *Johnston* case, the insured was a plumbing contractor and, at the time of his injury, was using the vehicle involved to go home at the close of his day's work. In this case, the insured was using the vehicle to haul hay, that is, he was actually trucking at the time he received the injuries resulting in his death. There is another slight difference, although we do not regard it as material. The policy in the *Johnston* case covered the insured while riding in a passenger automobile, and the exclusion clause read:

"The term 'passenger automobile' as used in this policy shall not include a truck or other automobile made or altered to carry merchandise, tools, or goods of any kind."

In this case, the policy covered the insured while riding in an automobile, the adjective "passenger" not being used, and the exclusion clause read: "any automobile truck," and, as the word "automobile" is therein used as an adjective, this phrase means the same as if the words had been "any self-propelled truck." The question clearly gets down to: Was the vehicle an automobile or a truck?

The trial judge, in his memorandum decision denying appellant's motion for judgment notwithstanding the verdict, said:

"If I were in error in submitting the question to the jury and if the matter is a question of the law for the court, then under the rule of construction applying to contracts of this nature, I would have to resolve the question against the defendant insurance company, holding the term 'automobile truck' in its policy includes only vehicles built and intended exclusively for heavy duty commercial transportation."

But there is a great deal of evidence in the record that there are such vehicles as "light trucks," such as truck manufacturers' catalogues and manuals classifying trucks as "light trucks" and "heavy duty trucks," and the plaintiff's own expert witness, in speaking of the very vehicle involved in this action, testified categorically, "It is a light truck." If this be true, if it be a truck of any kind, it must fall within the policy phrase "any automobile truck."

We are of the opinion that the *Johnston* case is more apposite to the question before us than the case of *Paltani v. Sentinel Life Ins. Co.*, 121 Neb. 447, 237 N. W. 392, which the trial judge twice cited in his memorandum opinion as authority for denying the defendant's motion for judgment notwithstanding the verdict, a distinction that he did not give to any other case. The actual decision in that case is found in the last paragraph of the opinion, which reads as follows:

"We are constrained to hold that a touring car, from which the body has been removed and a cabin placed on the

front with a small box for holding tools, and back of which is attached a hoisting device for lifting automobiles for the purpose of repairing and towing them along the highway, is not an automobile truck within the meaning of a provision of an accident insurance policy excluding liability for an accidental injury received while riding in or on any automobile truck."

That the question which confronts us in the case at bar is very remote from that which faced the Nebraska court in the *Paltani* case, will, we think, sufficiently appear as we detail the evidence adduced.

The insured operated a barber shop in Castle Rock. The family lived about a mile from town on a place of about four and a half acres. The vehicle involved in this action was used to go to town, to church, and to visit. The family had no other means of transportation, and it is contended, in respondent's brief, that the vehicle was used "mostly for passengers." Yet, the plaintiff beneficiary herself testified as follows:

"Q. As a private enterprise, you ran a little dairy ranch? A. Yes. Q. Did you deliver milk? A. Yes. Q. Every day? A. Yes. Q. At the time of the injury to Mr. Roller, you had 27 milk customers, did you not? A. I think so. Q. It was used every day for the purpose of delivery to your customers, was it not? A. Yes."

The vehicle under consideration had what the witnesses speak of as a "cab," which, by the way, is in and of itself truck language, and behind the cab, a steel box with a tailgate. This box, as shown by the Chevrolet specifications in evidence, was six feet long, slightly more than four feet wide, and sixteen and one-fourth inches in height (inside measurements). To increase its capacity for the hauling of hay, as the farmers of an earlier date increased the capacity of their farm wagons for the same purpose, the Rollers constructed, or had constructed by someone else, a hayrack the supports of which fitted into the box or bed of the vehicle, with arms extending far over on each side, apparently, from the clear pictures in evidence, at least four feet, possibly a little more.

On May 16, 1943, the insured, his two sons, and a nephew, taking the vehicle so equipped, drove about three miles into the country to get a load of hay. They loaded the vehicle and started home. The insured rode on top of the load. His fifteen-year-old son, who drove the vehicle, testified as follows: "Q. This load, how high was it? About as high as the cab? A. I would say it was a foot higher than the cab."

While driven at about fifteen miles per hour, the vehicle struck a hole or rut in the road, and the insured, perched on the unstable, loose hay with nothing in the world to grasp or hold to, fell off and sustained the injuries resulting in his death. The following is a passage from the boy's evidence which is, in part, relied upon as making a case for the jury. Under examination of his mother's counsel, he testified as follows: "Q. Did you people have a truck? A. No, we didn't. Q. You just had a pickup? A. Yes."

The weakness of this evidence is obvious. It cannot be considered as substantial evidence when compared with the following evidence which he gave a few minutes before when wholly unled and undirected:

"Q. Where was your father? A. On top. Q. On top of what? A. The load of hay. Q. Tell the court and jury how that was arranged? A. We had *that truck* and we had a rack to make it wider, and threw the hay on it, not very much, I should judge three or four hundred pounds; and he was going to ride on top and we let him." (Italics ours.)

Mr. Talbott, formerly engaged in the sale of automobiles under the name of Talbott's Chevrolet, was called as a witness by the plaintiff and testified that he sold the vehicle involved in this case to Mrs. Roller. We quote from his testimony in chief:

"Q. This particular car you sold to Mrs. Roller is what classification? A. What is commonly termed a half-ton pickup. Q. Do you know whether or not in the custom of the trade that that is considered among dealers and users as a truck or as a car of another classification? A. We never sold it as a truck in the sense of a heavy duty truck. We

classed it as to usage of the vehicle involved, as many were purchased by farmers. MR. HULL: Answer the question. Q. The question was, what was the classification based on, the use? MR. HULL: No, the question was, what was it known as in the trade. A. A half-ton pickup. Q. What would you say as to whether or not it was considered by the trade as an automobile truck or not? MR. HULL: That is objected to as leading, your Honor. THE COURT: Yes, it is leading. Q. All right. To what class of vehicles, then, did this particular half-ton vehicle belong according to use and the trade? A. Light delivery and passenger use as well. Q. What is the difference generally between the construction and design of this 1940 pickup and one of the trucks that is put out by the Chevrolet people? A. Your heavy duty trucks, from the start, are built on a heavier basis, and they have heavier optional equipment that can be built with heavier equipment, . . . Q. Under what name is this particular type of vehicle in question, what does it pass under generally among the users and customers? A. A half-ton pickup. Q. Do you know what is generally meant in the trade when you speak of an automobile truck? A. As I understand the term, 'automobile truck,' it covers the heavy duty equipment."

We quote from Mr. Talbott's testimony on cross-examination:

"Q. As a matter of fact, the half-ton pickup is manufactured and sold as a half-ton truck, isn't it? A. It depends on how close you draw the line. They are advertised as pickups. . . . Q. This purports to be the Chevrolet catalog of truck vehicles—automobile trucks, does it not? A. That's right. It was a pamphlet put out in its advertising. Q. In this classification, one of the trucks listed, do you find the half-ton pickup? A. I do. Q. It is there in the truck catalog? A. That is true. Q. You say, 'that is true.' *Then, it is actually manufactured and sold as a truck, isn't it? A. It would be sold as a light pickup truck. Q. It is a truck, isn't it, as a matter of fact? A. I wouldn't want to be the judge as to whether it was or wasn't. The factory called it a pickup truck. Q. And they listed it under the truck catalog? A. That's right. Q. The distinction between the half-ton pickup and the larger trucks is in the amount of weight they can carry, is that right? A. That would be true.* . . . Q. Then you would define a truck as one that carries a heavy load? A. That's right. . . .

Q. As a matter of fact, Mr. Talbott, the word, 'truck,' is a vernacular term and classifies all these freight vehicles? A. That's right. Q. And then you break them down into the different types of trucks and we have deliveries, heavy duties, dump trucks and quite a variety? A. That is true." (Italics ours.)

As will be later demonstrated from documentary evidence in the case, Mr. Talbott sold the vehicle to Mrs. Roller as "a Chevrolet Truck," and, as we view it, his testimony amounts to no more than an expression of his personal opinion that the manufacturer and other makers of similar vehicles, such as Dodge and Ford, ought not call such vehicles, trucks.

Plaintiff called Walter Mitchell, a supervisor of repairs in a Longview auto repair shop, and qualified him as an expert witness. We quote that portion of his testimony which, at first sight, might be thought to make a case for the jury:

"Q. In the trade and among the dealers and users of the Chevrolet, does the pickup have a classification by itself? A. We call them a half-ton pickup. Q. For heavy hauling, what do they call those vehicles? A. Heavy duty trucks, ton-and-a-half."

However, this evidence cannot be relied on as tending to establish the plaintiff's case, because, on cross-examination, Mr. Mitchell categorically testified as follows:

"Q. You say the half-ton pickup isn't a truck? A. It is a light truck; yes, sir. Q. It is a light truck? A. Yes, sir. MR. HULL: That's all. MR. REID: That's all. We rest, your Honor."

We now turn to an examination of some of the documentary exhibits.

The only exhibit introduced on behalf of the plaintiff in support of her case, which has any bearing on the question under discussion, is the conditional sales contract under which she purchased the vehicle from Talbott. The vehicle is described by typewritten matter, under headings, New or Used, Year Model, No. Cyl., Trade Name, and Type of Body, If Truck, Give Tonnage, and under this last heading

"If Truck, Give Tonnage" is typewritten: "½ T. Pick-up." Obviously, this can only mean that it was classified by the seller as a one-half ton truck. But, if there be any doubt about that, it is resolved by defendant's exhibit B 1, which is a duly authenticated photostatic copy of the vendor's "Dealer's Report of Sale" made, as required by law, to the state department of licenses. We quote the pertinent portion of this instrument: "This is to certify that Mrs. Emma Roller, Address Castle Rock, Wash., has purchased a Chevrolet Truck K2940192."

When this instrument was offered in evidence, it had attached to it, and also authenticated in the certificate of the director of licenses, a photostatic copy of another instrument. This was Mrs. Roller's formal application for a license for the vehicle. For some reason not clear to us, the trial judge refused to admit this exhibit or the certificate which authenticated both documents, but ordered the Dealer's Report of Sale to be detached and marked exhibit B 1. The trial court also refused to admit a duly authenticated photostatic copy of the license issued for the vehicle on Mrs. Roller's application. The following offer of proof was also rejected:

"MR. HULL: We would like to offer by this witness [Mrs. Roller] that she applied to the gas rationing board for coupons for use in the operation of a truck—this specific vehicle. We also offer to prove that the gas rationing board honored her application and issued gas rationing coupons for truck use and these gas rationing coupons give to her more gas per coupon than any other passenger car or pleasure type car. They are good for more miles per coupon and they are applicable for use on a truck and nothing else. We make that offer."

The jury, therefore, was not informed as to whether Mrs. Roller's vehicle was or was not licensed as a truck by the state department of licenses, or whether Mrs. Roller drew gasoline rations for it as a truck during the war period. However, there is documentary evidence which shows that she regarded it as a truck. Exhibit D is an insurance policy, taken out on the vehicle by Mrs. Roller, covering the period from June 25, 1942, to June 25, 1943, and, therefore,

in effect at the time of her husband's injury and death. In this, she declared that the vehicle "is to be used for commercial purposes." In this policy, we find the following definition:

"The term 'commercial' is defined as use principally in the business occupation of the named insured as stated in item 1, including occasional use for personal, pleasure, family and other business purposes."

(The occupation of the insured is stated in item 1 as follows: "Housewife (Dairy Delivery—House to House Delivery)."

It is also significant that under the caption "Truck Load Capacity" is typewritten "½ T. Pick-up."

Various Chevrolet booklets and advertising matter were introduced in which the vehicle is classified as a truck, but is sometimes referred to as a half-ton pickup. We will not describe these exhibits, nor detail the oral evidence given on behalf of the defendant, since our primary inquiry is as to whether there was any substantial evidence which would enable a jury to find that the vehicle was not a truck.

In the last analysis, the question to be decided is: What should the contracting parties, that is, the insurance company and Mr. Roller, have reasonably understood the coverage to be? It is clear enough that the agreement was that the company was to be liable if the insured was injured or died from injuries received while riding in an automobile, but that it was not to be liable if he was riding in or on "any automobile truck." Looking at the case in a broad and general way, it is very difficult to imagine that either party could have supposed that the company would be liable if the insured fell off a load of hay. Hay is not ordinarily harvested in automobiles.

It is argued that the vehicle is not a truck because it could be, and was in fact, used to carry passengers. A large, heavy duty truck has an even wider front seat and a larger bed behind the cab in which many passengers can be, and sometimes are, transported; but if, for example, such a vehicle be used to transport a troop of Boy Scouts to camp, it does not for that reason become an automobile, as distin-

guished from a truck. On the other hand, if one hauls a ton of lead in the rear seat and rear trunk of his sedan from one location to another, the vehicle remains a sedan. The determining factor is, in our opinion, the primary purpose for which the vehicle is designed. There are many vehicles of the type involved in daily usage. They are put out by a number of manufacturers. Everyone is familiar with them and with their appearance, as seen on our roads and streets and as represented in the advertising in our various periodicals. In our opinion, everyone regards them, and thinks of them, as trucks. We think that only "force of habit" can account for the strange and unique fact that the plaintiff herself, every one of her witnesses, and her attorney as well, at some time or another during the trial, referred to the vehicle as "a truck" or "the truck." Four witnesses gave testimony in support of plaintiff's case; the plaintiff herself, her son Richard, Mr. Talbott, and Mr. Mitchell. Mitchell went further than incidentally referring to the vehicle as a truck. He has, as we have already seen, categorically testified, "It is a light truck." Mr. Talbott did not go that far, but he did testify as follows:

"Q. It is a truck, isn't it, as a matter of fact? A. I wouldn't want to be the judge as to whether it was or wasn't. The factory called it a pickup truck."

He thus acknowledged that the vehicle was called a truck by its maker, and, as we have seen from his conditional sales contract (plaintiff's exhibit 1), he sold it to the plaintiff as a truck, and it is in evidence that he reported to the license department that he had sold a "Chevrolet Truck" to the plaintiff. True, it was his personal opinion that the designation "truck" ought to be reserved for heavy duty vehicles only, but that is wholly irrelevant.

Plaintiff's son, Richard Roller, as we have seen, in answer to a leading question, said the vehicle was a pickup and not a truck, but, when asked to describe the operation which resulted in the accident, said: "We had *that truck* and we had a rack to make it wider, and threw the hay on it, . . ." (Italics ours.)

The plaintiff herself, when asked by her counsel, "What did you usually refer to this vehicle as?" replied: "My car, is what I called it," but, when her attention was diverted to other matters, she called the vehicle a truck. Calling her attention to a manual which goes with every Chevrolet vehicle sold as part of the equipment, defendant's counsel interrogated the plaintiff as follows:

"Q. Did you examine it at all? A. No. Q. But you recognize it? A. I am sure it is. *It is in the truck.* It looks like that. Q. It was in that when you bought it? A. *Well, it was in the truck.*" (Italics ours.)

It was even more difficult for plaintiff's counsel to rid himself of the seemingly fixed impression that the vehicle was a truck.

We find, on page 6 of the statement of facts, that counsel completed his opening statement to the jury as follows:

"In closing, Ladies and Gentlemen, we expect to prove to you that a Chevrolet pickup is a light pickup and is not a truck. Thank you."

We need proceed no further into the statement of facts than page 13 to find counsel propounding the following questions to his client:

"Mrs. Roller, have you ever owned any other kind of truck except a one-half ton? . . . You had no other means of transportation except the Chevrolet truck? . . . On this day in question, the 16th day of May, did you see what the truck was being used for?"

The plaintiff offered no evidence which entitled her case to go to the jury. On the contrary, in presenting her case, she established the soundness of the defendant's contention that the insured received the injury which resulted in his death while riding on a truckload of hay. To recapitulate: She proved, by the introduction of the conditional sales agreement, that she purchased the vehicle so used as a truck. She identified an insurance policy, which went into evidence during the presentation of her case, which shows that, at the very time her husband fell from the vehicle, it was insured as a truck used for "commercial purposes." In giving her testimony, she herself twice

called the vehicle a truck. Her first witness, her son Richard, who drove the vehicle on the ill-fated haying expedition, in testifying, said: "We had *that truck* and we had a rack to make it wider, and threw the hay on it, . . ." (Italics ours.)

Her next witness, Talbott, admitted that the vehicle was classified and advertised by its manufacturer as a truck, and Mitchell, her only other witness, called and qualified as an expert, testified that the vehicle was "a light truck."

We also find in the record the following testimony which is of firsthand importance. It was given by the plaintiff herself while under examination by her own counsel:

"Q. On this day in question, the 16th day of May, did you see what the truck was being used for? A. Yes. Q. What was it? A. Going to get a bunch of hay my brother-in-law gave me."

It was at all times the defendant's sole and only contention that the vehicle used in going to get that bunch of hay was a truck.

■ The appellant assigns the denial of its motion for nonsuit as reversible error. We think, however, that it waived the error by going on and producing evidence on its own behalf. However, we find nothing in the evidence, so introduced, which in any way tends to support the plaintiff's case. It follows that the other assignments of error are well taken.

The judgment appealed from is reversed, with direction to the trial court to dismiss the action.

SIMPSON, BEALS, BLAKE, and JEFFERS, JJ., concur.